# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ALLINA HEALTH SERVICES, *et. al.*, | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| v. | )    Civil Action No. 10-1463 (RMC) <br> ) |
| KATHLEEN SEBELIUS, Secretary, <br> U.S. Department of Health and <br> Human Services, | ) <br> ) <br> ) <br> ) |
| Defendant. | ) <br> ) |

## MEMORANDUM OPINION

Plaintiff Hospitals[1] bring suit under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*., and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., challenging the interpretation by the U.S. Department of Health and Human Services of a specific kind of Medicare payment. Pending before the Court are the parties' cross-motions. The Hospitals seek a preliminary injunction to direct the Secretary of HHS to amend its methodology while the Secretary moves the Court to stay this matter pending the resolution of an appeal in a related case by the D.C. Circuit. *See Northeast Hospital Corp. v. Sebelius*, 699 F. Supp. 2d 81 (D.D.C. 2010), *appeal docketed*, No. 10-5163 (D.C. Cir. May 27, 2010). *See* Def.'s

---

[1] Plaintiff Hospitals include Allina Health Services, Highland Hospital of Rochester, Kaleida Health, Kingsbrook Jewish Medical Center, Lutheran Medical Center, Maimonides Medical Center, Methodist Dallas Medical Center, Methodist Hospitals of Dallas, Montefiore Medical Center, Mount Sinai Medical Center of Florida, Inc., New York Hospital Medical Center of Queens, New York Methodist Hospital, New York Presbyterian Hospital, North Carolina Baptist Hospital, North Shore Long Island Jewish Health System, Inc., Shands Medical Center, Inc., Shands Teaching Hospital and Clinics, Inc., University of Rochester, Florida Health Sciences Center, Inc., and the Henry Ford Health System.

Mot. to Stay Proceedings [Dkt. # 7]. The parties agree that the D.C. Circuit's decision in *Northeast* will likely be dispositive of the merits of this case. *See id*. at 2; Pls.' Reply in Supp. of Mot. for Prelim. Inj. [Dkt. # 14] 1, 3. For reasons articulated below, the Court will deny the Plaintiffs' request for a preliminary injunction without prejudice and will grant the Secretary's motion for a stay until the D.C. Circuit renders its opinion on the *Northeast* appeal.

## I. FACTS

The Secretary administers Medicare through the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS. The Medicare program includes Part A, which authorizes payments to hospitals for covered inpatient services, *see* 42 U.S.C. § 1395c to 1395i-4, based on prospectively determined, standardized, national and regional rates, rather than on the actual operating costs incurred by providers. *Id*. § 1395ww(d)(1)-(4); *see also Southeast Alabama Med. Ctr. v. Sebelius*, 572 F.3d 912, 914 (D.C. Cir. 2009). However, the system allows for certain upward payment adjustments based on hospital-specific factors, including a "disproportionate share hospital" ("DSH") adjustment. DSH provides an upward adjustment for hospitals that serve a disproportionate number of low-income patients, due to the higher costs incurred by serving this population. *See* 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

This case focuses on the method by which the Secretary calculates whether and to what extent a hospital qualifies for such an adjustment, based, in part, on the hospital's "disproportionate patient percentage." *See id*. § 1395ww(d)(5)(F). The disproportionate patient percentage is a statutory formula determined by adding the results of two fractions and expressing that sum as a percentage. The two computations are: (a) the Medicare/Supplemental Security Income ("SSI") fraction, and (b) the Medicaid fraction. *Id*. § 1395ww(d)(5)(F)(vi))(I),

(II); *see also* 42 C.F.R. § 412.106(2)(b).  The SSI fraction is meant as a proxy for low-income Medicare patients and is defined as:

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were *entitled to benefits under part A* of [Title XVIII] and were entitled to [SSI] benefits (excluding any State supplementation) under [Title] XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were *entitled to benefits under part A* of [Title XVIII] . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added).  The SSI fraction is therefore based on the number of patient days that are attributable to individuals who are receiving SSI benefits and who are "entitled to benefits under part A."

A Medicare beneficiary has the option to receive benefits for hospital care under Medicare Part C, also called the Medicare Advantage program, instead of Part A.  *See id.* § 1395w-21(a)(1); 42 C.F.R. § 422.50.  Part C allows beneficiaries to enroll with private health organizations, such as a health maintenance organization (HMO), which have entered into a payment contract with Medicare.  The Medicare program does not pay hospitals directly for services provided to patients enrolled in Part C plans.  Instead, CMS contracts with these private health organizations, and pays them directly for services provided to Part C enrollees at pre-determined per-patient rates.  *See* 42 U.S.C. § 1395w-23(f), -27, -21(i)(1)–(2).

While the obligations of a Medicare Advantage plan to a Part C enrollee are heavily regulated by federal law and federal contracts, the terms of the contractual relationship between the plan and the hospital, or other health care provider, are left largely to the parties to negotiate and define.  This includes the financial terms and reimbursement rates within the

contract. Thus, if a dispute erupts between a Medicare Advantage organization and a hospital, for instance, neither the Medicare Advantage statute, nor CMS's regulations, nor CMS's contract with the insurer provides terms of resolution.

In certain situations, Medicare Advantage plans are required to pay for services provided to their enrollees even though the plans do not have a contract with the hospital in question. *See* 42 C.F.R. § 422.100(b). In such a case, the hospital must "accept as payment in full," the amount that would have been paid by Medicare Part A as if the services had been provided on that basis. 42 U.S.C. § 1395cc(a)(1)(O). CMS has not further defined this statutory requirement through regulation. *See* 42 C.F.R. § 422.214. CMS does, however, make information available so that hospitals and Medicare Advantage plans can estimate what Medicare Part A would have paid for a particular service.

The Hospitals challenge the Secretary's current definition of the term "entitled to benefits" under Medicare Part A per the DSH statute. Prior to 2004, the Secretary interpreted the Medicare DSH statute to exclude Part C days in the SSI fraction, *i.e.*, Part C enrollees were not counted as being entitled to benefits under Part A. However, the Secretary changed course in 2004, *see* 69 Fed. Reg. 48916, 49099 (Aug. 11, 2004), although the policy was not immediately implemented. Starting with federal fiscal year 2007 claims, the Secretary has employed an SSI fraction which includes Part C patient days, thereby finding that Part C patients are entitled to benefits under Part A. Plaintiffs sue to block the Secretary from including Part C days in the SSI fraction.

## II. LEGAL STANDARD

A district court has broad discretion to stay a proceeding pending the resolution of

proceedings in other courts where the other proceedings may affect the scope and necessity for the litigation. *IBT/HERE Employee Representatives' Council v. Gate Gourmet Div. Am.*, 402 F. Supp. 2d 289, 292–93 (D.D.C. 2005); *see also Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 879 n.6 (1998). Therefore, "[a] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *IBT/HERE*, 402 F. Supp. 2d at 292 (quoting *Leyva v. Certified Grocers of Cal., Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979)).

A district court may grant a preliminary injunction "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. Of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). An injunction is an equitable remedy so its issuance is one which falls within the sound discretion of the district court. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). However, an injunction is an extraordinary and drastic form of relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). A plaintiff seeking a preliminary injunction must establish that:

>  (a) he is likely to succeed on the merits;
>  (b) that he is likely to suffer irreparable harm in the absence of preliminary relief;
>  (c) that the balance of equities tips in his favor; and
>  (d) that an injunction is in the public interest.

5

*Winter v. NRDC, Inc.*, 129 S. Ct. 365, 374 (2008); *accord Ark. Dairy Coop Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821 (D.C. Cir. 2009).

The foregoing factors should be balanced on a "sliding scale," *i.e.*, a lesser showing on one factor can be surmounted by a greater showing on another factor. *CSX Transp., Inc. v. Williams*, 406 F.3d 667 (D.C. Cir. 2005). Even so, in order to justify intruding into the ordinary litigation process by issuing a preliminary injunction, it is critical that a movant 1) make a substantial showing of likelihood of success on the merits and 2) make a showing of at least some injury. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). A preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

### III. ANALYSIS

#### A. Likelihood of Success on the Merits

The parties agree that the resolution of *Northeast* by the D.C. Circuit will be dispositive of the claims in this matter.[2] *See* Def.'s Mot. to Stay 2; Pls.' Reply in Supp. of Mot.

---

[2] The Secretary's appeal of the district court decision was docketed as No. 10-5163, *see Northeast Hospital Corp. v. Sebelius*, No. 10-5163 (D.C. Cir. filed May 27, 2010), whereas Plaintiff Northeast Hospital Corporation filed a cross-appeal, docketed as No. 10-5185, *see Northeast Hospital Corp. v. Sebelius*, No. 10-5185 (D.C. Cir. June 6, 2010). The parties in this matter refer to the appeal as No. 10-5185 because the D.C. Circuit consolidated the Secretary's appeal with the cross-appeal. *See Northeast*, No. 10-5185, Order Consolidating Cases [Dkt. # 1252546] (D.C. Cir. June 29, 2010). However, by joint stipulation, *see id.*, Joint Stipulation of Dismissal [Dkt. # 1272284] (D.C. Cir. Oct. 19, 2010), Northeast Hospital Corporation's cross-appeal was dismissed. Accordingly, the D.C. Circuit dismissed the cross-appeal, No. 10-5185, and terminated the consolidation of the cases. *See id.*, Order Dismissing No. 10-5185 [Dkt. # 1272655] (D.C. Cir. Oct. 20, 2010). Therefore, while the parties continue to refer to the *Northeast* appeal as No. 10-5185 in their briefs, it is now in fact case No. 10-5163.

for Prelim. Inj. [Dkt. # 14] 1, 3. Despite the pending decision by the D.C. Circuit, the Hospitals point to the reasoning of the *Northeast* district court as proof that they will likely succeed on the merits and, in fact, believe the *Northeast* decision and stare decisis compel this Court to come to the same conclusion.³ *See* Reply 3 (citing to *Brewster v. Commissioner*, 607 F.2d 1369, 1373 (D.C. Cir. 1979) ("Stare decisis compels adherence to a prior factually indistinguishable decision of a controlling court. This principle assumes increased importance when the antecedent case involves construction of a statute.") (internal citations omitted)). Stare decisis is inapplicable here as the *Northeast* district court is not a controlling court. Although the decision may be persuasive, "one district court decision is not binding on another district court." *Am. Council of the Blind v. Wash. Metro. Area Transit Auth.*, 133 F. Supp. 2d 66, 74 n.2 (D.D.C. 2001); *accord In re Executive Office of the President*, 215 F.3d 20, 24 (D.C. Cir. 2000) ("District Court decisions do not establish the law of the circuit, nor, indeed, do they even establish the law of the district.") (citations and internal quotation marks omitted).

        The Hospitals ask this Court to evaluate, and rely on, the decision of another judge of this district to find the Secretary's actions unlawful despite the fact that the D.C. Circuit is currently reviewing the same opinion and will soon issue a controlling decision in this matter. Ultimately, an injunction is not a remedy that "issues as of course." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). This is true even when a plaintiff demonstrates a substantial likelihood that a challenged agency action was unlawful. *See Amoco Prod. Co. v.*

---

³ Plaintiffs also move the Court to convert their motion for a preliminary injunction to a motion for summary judgment, and upon deciding this case on its merits, grant the Plaintiffs both declaratory and injunctive relief. *See* Reply 3. For the reasons stated in this decision, this motion will also be denied.

*Vill. of Gambell*, 480 U.S. 531, 542 (1987) ("[The] grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.") (internal citation omitted), *National Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, it is not required to set aside every unlawful agency action. The court's decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity."). Even assuming the Hospitals have demonstrated a likelihood of success on the merits, the Court will nonetheless deny its motion for a preliminary injunction without prejudice in light of the imminence of a controlling decision from the D.C. Circuit and the public interest.

### B. Irreparable Harm

The Hospitals argue they are suffering irreparable harm because the inclusion of Part C days in the SSI fraction is irretrievably depriving them of significant Medicare Advantage payments. Specifically, the damage to the Hospitals caused by the Secretary's 2007 SSI fraction derives from not only out-of-network payments, where a plan pays a hospital what Part A would have paid for the same services, but also, many plans with whom Plaintiffs contract also negotiate rates that pay what Part A would have paid. Representing approximately twenty-nine non-profit hospitals, Plaintiffs argue they collectively lost more than $22 million dollars over the first year following the publication of the challenged fraction, from September 1, 2009 through August 30, 2010. *See* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. [Dkt. # 9] 18; Reply 5.

A plaintiff faces a high burden to demonstrate irreparable injury. The injury "must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*,

758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). "The moving party must show the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted). The injury must also be without remedy. As the Circuit has held: "The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id*. at 297–98 (quoting *Virginia Petroleum Jobbers Asso. v. Federal Power Com.*, 259 F.2d 921, 925 (D.C. Cir. 1958)) (internal quotation marks omitted).

The "general rule [is] that economic harm does not constitute irreparable injury." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). Harm that is "merely economic" in character is typically not sufficiently grave under the irreparable injury standard. *See, e.g., Robinson-Reeder v. Am. Council on Educ.*, 626 F. Supp. 2d 11, 14 (D.D.C. 2009); *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) (noting that where the alleged injury was admittedly economic, movant must compensate by demonstrating the severity of its alleged economic harm).

Alleged economic injury must be "more than simply irretrievable," *Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 123 (D.D.C. 2007); it must also be "serious in terms of its effect on the plaintiff." *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008); *accord Toxco Inc. v. Chu*, Civ. No. 09-1925, 2010 U.S. Dist. LEXIS 72567, *39 (D.D.C. July 20, 2010). Therefore, an inability to recover lost profits or payments does not always constitute

9

irreparable harm. *See LG Electronics, U.S.A., Inc. v. Dep't of Energy*, 679 F. Supp. 2d 18, 35–36 (D.D.C. 2010) (noting that "[e]ven assuming [the plaintiff] will not be able to recover monetary damages from DOE . . . the financial impact [the plaintiff] claims it will suffer does not rise to the level of irreparable harm" as those losses represented "a minuscule portion of the company's worldwide revenues"), *Coal. for Common Sense in Gov't Procurement*, 576 F. Supp. 2d at 169–70 (holding that the plaintiff's claims of lost income, even if irretrievable, did not rise to the level of irreparable harm because the losses amounted to a fraction of the plaintiff's overall business), *Sandoz, Inc. v. F.D.A.*, 439 F. Supp. 2d 26, 31–32 (D.D.C. 2006) (holding that even if the court were to credit the plaintiff's allegations of thirty one million dollars in irretrievably lost sales during the pendency of the litigation, the economic loss was insufficiently severe in the context of the plaintiff's overall business operations to warrant a finding of irreparable harm), *Apotex, Inc. v. Food & Drug Admin.*, Civ. No. 06-0627, 2006 U.S. Dist. LEXIS 20894, *53–57 (D.D.C. Apr. 19, 2006) (concluding that the plaintiff's lost sales during the pendency of the litigation, even if irretrievable, were insufficiently severe to constitute irreparable harm); *but see Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010) ("It is also worth noting that even if the claimed economic injury did not threaten plaintiffs' viability, it is still irreparable because plaintiffs cannot recover money damages against FDA. Where a plaintiff cannot recover damages from an agency because the agency has sovereign immunity, any loss of income suffered by [the] plaintiff is irreparable *per se*.") (quotations and citations omitted) *aff'd* No. 10-5032, slip. op. (D.C. Cir. Dec. 7, 2010), *Bracco Diagnostics v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (noting that alleged irretrievable economic harm would result in "significant and irreparable" injury as plaintiffs were small companies).

The Secretary contends that the harm alleged by the Hospitals represents a small economic loss to the Hospitals so that even if irretrievable, the loss does not rise to the level of irreparable harm. Plaintiffs counter that they operate on "razor-thin margins" or at a loss. Reply 7. By the Hospitals' estimate, the yearly impact per hospital ranges from $95,101 to a high of $3.4 million, with an average yearly loss of approximately $789,000 per hospital. *See* Reply, [Ex. 2] Summary of Economic Impact on Plaintiffs.[4] However, none of the Hospitals alleges that the claimed loss has endangered its viability or has impacted its ability to provide services.

The Hospitals' claim of irreparable injury is somewhat speculative, as it is unclear to what extent an injunction would remedy the injury. The Secretary asserts that even if she were ordered to cease using the published 2007 SSI fraction, or any fraction that included Part C days, it would not necessarily follow that Medicare Advantage plans would also stop using the 2007 fraction, or an SSI fraction that included Part C days, let alone start paying the Hospitals greater amounts. Opp'n [Dkt. # 13] 16. While the insurance plans must pay out-of-network providers an amount equal to the amount Part A would pay for the same hospital services, it appears that the Secretary does not mandate a precise amount and the Medicare Advantage plans are free to use their own calculation. *See* Opp'n, [Ex. 3] Decl. of William London, Office of the Actuary, CMS, ¶¶ 4, 6–10. Thus, even if the Secretary were directed to change the SSI fraction, it appears that some plans could disregard the Secretary's new fraction to calculate out-of-network payments.

The Medicare DSH system provides for a great deal of flexibility in its joints. In

---

[4] The $789,000 average is derived from Plaintiffs' Summary of Economic Impact. It appears from the document that twenty-nine individual hospitals suffered a combined yearly loss of $22,893,850. *See* Reply, [Ex. 2] Summary of Economic Impact on Plaintiffs.

the end, Medicare Advantage plans are not parties to this action, so the amount, degree, and pace of financial relief the Hospitals would enjoy from an injunction against the Secretary remains speculative and largely dependent upon the actions of third parties. The Hospitals undoubtedly suffer from a meaningful loss in payments, but when the amount of the alleged economic injury is viewed in context of the speculative nature of the requested injunction to fully remedy the loss, the question of whether the Hospitals have satisfied their burden of demonstrating irreparable harm becomes a close one.

### C. Balance of Equities

Just as the Hospitals argue that lost payments are irretrievable if they ultimately prevail, the corollary is that if the Court issued an injunction and the Secretary ultimately prevailed, the Medicare Advantage plans and the Secretary would likely be unable to recover whatever additional amounts they will have paid the Hospitals. *See* Opp'n 4, 32. The balance of equities weighs against an injunction as the alleged irreparable economic injury suffered by the Plaintiffs would be offset by the corresponding economic injury to the Secretary or third party Medicare Advantage plans. *See Virginia Petroleum*, 259 F.2d at 925 ("Relief saving one claimant from irreparable injury, at the expense of similar harm caused another, might not qualify as the equitable judgment that a stay represents."), *Amoco*, 480 U.S. at 542 (noting that in considering a claim of irreparable injury, "a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief"); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). The Hospitals have failed to demonstrate that the "balance of equities tips in [their] favor." *Winter*, 129 S. Ct. at 374.

**D. Whether An Injunction Would Be in the Public Interest**

A consideration of the effect of an injunction on the public interest is a predominant concern here. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 129 S. Ct. at 376–77 (quoting *Romero-Barcelo*, 456 U.S. at 312); *Romero-Barcelo*, 456 U.S. at 312 (noting that where an injunction is sought that would adversely affect the public interest, a court may deny the relief until an adjudication of the merits, even where postponement may be burdensome to the plaintiff). It is axiomatic that the purpose of a preliminary injunction is to preserve the status quo pending a hearing on the merits, *Camenisch*, 451 U.S. at 395, yet the Hospitals seek to disrupt the status quo by forcing the Secretary to change the SSI fraction pending a disposition on the merits before this Court and a related appeal before the D.C. Circuit. It is also noteworthy that the Hospitals seek a mandatory, as opposed to a prohibitive injunction. Some courts have held the movant for a mandatory injunction to a higher burden, although the D.C. Circuit has yet to address this question.[5]

---

[5] For instance, this Court found:

> The party that moves for a mandatory preliminary injunction must do more than merely raise a serious question about the law under which its predicates the right of recovery. In such cases, "where a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite*, courts should be extremely cautious about issuing a preliminary injunction." *Stanley v. University of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994). Thus, "where an injunction is mandatory--that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act--the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction." *Phillip v.*

Plaintiffs argue that equity favors an injunction as the purpose of the Medicare DSH statute is to compensate hospitals for the higher costs of medical care to low-income patients. Pls.' Mem. 35 (citing to *Jewish Hosp. v. Secretary of Health & Human Servs.*, 19 F.3d 270, 275 (6th Cir. 1994) (noting that the overarching intent of Congress in adopting the DSH payment scheme was to supplement resources available to hospitals serving low-income persons and to "ensure the continued operation of these facilities for the benefit of those persons who have no other health care alternative")). Plaintiffs further argue that compliance with the law serves the public interest. *See, e.g., In re Medicare Reimbursement Litig.*, 309 F. Supp. 2d 89, 99 (D.D.C. 2004) (holding, in a mandamus action, that "the Secretary's compliance with applicable law constitutes a separate, compelling public interest"), *aff'd* 414 F.3d 7 (D.C. Cir. 2005). It is also true that a court will not reflexively issue an injunction just because a movant has shown there to be a violation of the law. *Amoco Prod. Co.*, 480 U.S. at 542. The services provided by the Hospitals to a population in need undoubtedly benefits the public interest and it is

---

*Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997). As a rule, "when a mandatory preliminary injunction is requested, the district court should deny such relief 'unless the facts and law clearly favor the moving party.'" *Id*. (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979)) (emphasis added); *accord Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

*Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi*, 15 F. Supp. 2d 1, 4–5 (D.D.C. 1997); *accord In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 123 (D.D.C. 2007), *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 (D.D.C. 2001), *Adair v. England*, 217 F. Supp. 2d 1, 3 n.6 (D.D.C. 2002). The D.C. Circuit has yet to adopt or reject a heightened burden for mandatory injunctions. *See Columbia Hosp. for Women Found. v. Bank of Tokyo-Mitsubishi*, No. 97-7225, 1998 U.S. App. LEXIS 7871 (D.C. Cir. Apr. 17, 1998), *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 834 n.31 (D.C. Cir. 1984); *but see Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.") (internal quotation marks omitted).

uncontested these services fit within the purpose of the Medicare DSH program. However, this is not a situation where only an injunction can vindicate the purpose of the statute in question, nor one where the statute "compel[s]" such an extraordinary remedy. *See Romero-Barcelo*, 456 U.S. at 313–14. The rights sought to be vindicated by Plaintiffs will be addressed through this litigation and the *Northeast* appeal.

The Court finds that the public interest would be harmed if an injunction were granted. The Hospitals seek to force the Secretary to change the DSH payment scheme, based on a general application statute that applies to hospitals and other providers. The burden of this injunction on the Secretary and the interruption it could cause to DSH payments would be great. This is not a dispute over a specific reimbursement or payment, but the method of calculating the SSI fraction which applies to all entities involved in the DSH scheme. Even if, as the Hospitals argue in their reply, *see* Reply 13–14, the injunction could be narrowly tailored to apply only to the Plaintiffs, this would nonetheless create an enormous burden to the entire DSH payment scheme by forcing the Secretary, and possibly the Medicare Advantage plans, to recognize a few exceptions to the payment processing system. The public interest is served by the consistent and uniform application of regulations to similarly-situated parties, without carving out judicial exceptions for individual parties through the injunction mechanism.

Further, the public interest would not be served by such a disruptive remedy in light of the D.C. Circuit's impending and controlling decision on the legal issue which will provide an opportunity for the Secretary, if changes are required, to alter the DSH payment scheme consistently and uniformly. *Winter*, 129 S. Ct. at 378 ("The policy against the imposition of judicial restraints prior to an adjudication of the merits becomes more significant when there is

reason to believe that the decree will be burdensome.") (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.2, p. 167–68 (2d ed. 1995)).  Therefore, despite the fact that some measure of irreparable injury might result to the Hospitals until the D.C. Circuit renders its decision in *Northeast*, the Court will deny the motion for a preliminary injunction, without prejudice, based on the balance of equities and the harm it would cause to the public interest.  *See Romero-Barcelo*, 456 U.S. at 312.

### E.  The Secretary's Motion to Stay

As the parties agree that the resolution of *Northeast* by the D.C. Circuit will be dispositive of the Plaintiffs' arguments here, the Secretary argues a stay "is appropriate, will further judicial economy, and will save time and expense for the parties."  Def.'s Mot. to Stay 2.  The D.C. Circuit is scheduled to hear oral arguments on the *Northeast* appeal on February 11, 2011, *see Northeast Hospital Corp. v. Sebelius*, No. 10-5163, Scheduling Order [Dkt. # 1282042] (D.C. Cir. Dec. 8, 2010), and the Court anticipates a decision not long thereafter.  The Court therefore finds good cause to stay this matter.  "A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case."  *IBT/HERE*, 402 F. Supp. 2d at 292 (quoting *Leyva*, 593 F.2d at 863–64).

## IV.  CONCLUSION

The plaintiff in *Northeast* sought an injunction on a different matter and the district court found "[e]ven assuming that this Court has the authority to 'enjoin the Secretary' in the manner requested by the Hospital, then, nothing in the record suggests that such an aggressive approach is warranted at this time."  *Northeast*, 699 F. Supp. 2d at 96.  The Court finds

16

resonance in this statement.  The Hospitals' motion for a preliminary injunction will be denied without prejudice and the Defendant's motion for a stay will be granted.  Accordingly, this case will be stayed until the D.C. Circuit issues its decision in *Northeast Hospital Corp. v. Sebelius*, No. 10-5163 (D.C. Cir. filed May 27, 2010).  The parties shall file notice of the Circuit's *Northeast* decision within ten days of its issuance.  Further, the Secretary shall file an answer or otherwise respond to the Complaint within twenty days of the *Northeast* decision.  A memorializing Order accompanies this Memorandum Opinion.

Date: December 22, 2010                                  /s/
                                                                    ROSEMARY M. COLLYER
                                                                    United States District Judge