**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
**ALLINA HEALTH SERVICES,** *et al.*,          )
                                                          )
              **Plaintiffs,**                          )
                                                          )
       **v.**                                            )        **Civil Action No. 10-1463 (RMC)**
                                                          )
**KATHLEEN SEBELIUS, Secretary,**         )
**U.S. Department of Health and**              )
**Human Services,**                                )
                                                          )
              **Defendant.**                          )
_____  )

**OPINION**

Medicare, a federal program that pays for health coverage for most Americans aged 65 and older is, to put it mildly, a complex program with reams of statutory provisions and regulations. Banking on this complexity to execute a fancy two-step, the Secretary of Health and Human Services excuses a lack of proper rulemaking and reasoned explanation for a new statutory interpretation of the reimbursement formula for certain hospitals serving low-income patients in the hopes that the Court will defer to her expertise. The Court recognizes both the Secretary's expertise and the flaws in the procedures she defends, with deference to the former but not to the latter.

Plaintiffs[1] are twenty-seven hospitals that serve "a significantly disproportionate share of low-income patients" without private health insurance. Consolidated Omnibus Budget

---

[1] Plaintiff Hospitals include Allina Health Services, Highland Hospital of Rochester, Kaleida Health, Kingsbrook Jewish Medical Center, Lutheran Medical Center, Maimonides Medical Center, Methodist Dallas Medical Center, Methodist Hospitals of Dallas, Montefiore Medical Center, Mount Sinai Medical Center of Florida, Inc., New York Hospital Medical Center of Queens, New York Methodist Hospital, New York Presbyterian Hospital, North Carolina Baptist

1

Reconciliation Act of 1985, Pub. L. No. 99-272, § 9105 (1986) (COBRA); 42 U.S.C. § 1395ww(d)(5)(F)(i)(I); *see also North Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 92 (D.C. Cir. 1999). Medicare pays such disproportionate share hospitals (DSH) additional monies, on top of Medicare's normal fees-for-service, to help cover the costs associated with the care of the very poor. This case concerns the formula for calculating DSH payments, a messy and incomplete rulemaking process, and the Secretary's unreasoned change in statutory interpretation.

## I.    FACTS

This is not the first time the Secretary's calculation of DSH payments has been litigated recently. The D.C. Circuit noted the Secretary's "about-face in 2004," when she announced her new interpretation of the statute in a preamble to a final rule. *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 15 (D.C. Cir. 2011).[2] Therefore, in reviewing this record and deciding this case, the Court starts with the proposition that the Secretary had a different practice for calculating DSH payments at least until 2004, when she abruptly announced a change in policy. The Court relies for background on *Northeast Hospital*, which lays out the dispute in "numbing detail," *id.* at 18 (Kavanaugh, J., concurring), and will advance to the immediate issues here.

---

Hospital, North Shore Long Island Jewish Health System, Inc., Shands Medical Center, Inc., Shands Teaching Hospital and Clinics, Inc., University of Rochester, Florida Health Sciences Center, Inc., and the Henry Ford Health System.

[2] The Secretary's pretense in briefing the instant matter—that her current interpretation is entirely consistent with the past—is, as the Court explains below, clearly forestalled by *Northeast Hospital.* It is also irregular legal gamesmanship, which wastes time and casts unfortunate doubt on counsel's credibility. The D.C. Circuit has ruled and the Secretary is not free to pretend otherwise when in this Circuit. If such an argument were to be made properly, it would at least need to recognize precedent and attempt to distinguish or argue to change it. Nothing of the kind happened here.

### A.      The Medicare DSH Payment System

Medicare pays benefits through different plans, three of which are relevant here. "Plan A covers medical services furnished by hospitals and other institutional care providers." *Id.* at 2; 42 U.S.C. §§ 1395c to 1395i-5.  "Part B is an optional supplemental insurance program that pays for medical items and services not covered by Part A, including outpatient physician services, clinical laboratory tests, and durable medical equipment."  *Ne. Hosp.*, 657 F.3d at 2; 42 U.S.C. §§ 1395j to 1395w-4.  "Part C governs the 'Medicare + Choice' (M+C) program, which gives Medicare beneficiaries an alternative to the traditional Part A fee-for-service system," allowing enrollment in a managed care plan.  *Id.*; *see* 42 U.S.C. §§ 1395w-21 to 1395w-29.  The Secretary pays the health care provider directly under Parts A and B but pays the managed-care plan under Part C, which in turn pays the provider.

DSH payment adjustments depend on the DSH percentage for each hospital, determined by way of a complicated statutory formula.  It involves adding the results of two computations and expressing the sum as a percentage referred to as the "disproportionate patient percentage."  42 U.S.C. § 1395ww(d)(5)(F)(vi).  One computation is identified as the Medicare/Supplemental Security Income (SSI) fraction and the other is identified as the Medicaid fraction.  42 U.S.C. §§ 1395ww(d)(5)(F)(vi)(I) (Medicare/SSI fraction) & (II) (Medicaid fraction); *see also* 42 C.F.R. § 412.106(b) (2012).[3]

The Medicare/SSI fraction is meant as a proxy for low-income Medicare patients and is defined as:

> [T]he fraction (expressed as a percentage), the numerator of which
> is the number of such hospital's patient days for such period which

---

[3] SSI is a federal program that pays stipends to people who are aged, blind or disabled; most SSI recipients are entitled to Medicare coverage.  Medicaid is a joint federal-state program, managed by the states, which provides health coverage for low-income adults, children and the disabled.

> were made up of patients who (for such days) were *entitled to*
> *benefits under part A* of [Title XVIII] and were entitled to [SSI]
> benefits (excluding any State supplementation) under [Title] XVI
> of this chapter, and the denominator of which is the number of
> such hospital's patient days for such fiscal year which were made
> up of patients who (for such days) were *entitled to benefits under*
> *part A* of [Title XVIII] . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) (emphasis added).  Thus, the Medicare/SSI fraction is based

on the number of a hospital's patient days for individuals entitled to both Medicare Part A and

SSI benefits on the top of the fraction over the number of patient days for all patients under Part

A on the bottom.

The statute defines the Medicaid fraction, meant as a proxy for low-income, non-

Medicare patients, as:

> [T]he fraction (expressed as a percentage), the numerator of which
> is the number of the hospital's patient days for such period which
> consist of patients who (for such days) were eligible for medical
> assistance under a State [Medicaid] plan . . . but who were not
> entitled to benefits under [Medicare] Part A . . . and the
> denominator of which is the total number of the hospital's patient
> days for such period.

*Id.* § 1395ww(d)(5)(F)(vi)(II).  Thus, the Medicaid fraction is based on the number of a

hospital's patient days for individuals who are eligible for Medicaid, but are not entitled to

benefits under Medicare Part A, over the total number of all patient days for the hospital.

M+C was established by Congress as part of the Balanced Budget Act of 1997

(BBA), Pub. L. No. 105-33 (1997).  The M+C program is now known as the Medicare

Advantage (MA) program.[4]  Wherever possible, the Court uses either "M+C" or "Part C" to be

consistent with the record and the briefs.  In order to enroll in M+C, an individual must be

---

[4]   *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No.
108-173, § 201(b), 117 Stat, 2066, 2176 (2003).

"entitled to benefits under part A . . . and enrolled under part B."   42 U.S.C. § 13952-21(a)(3)(A).

After implementation of M+C, "between 1999 and 2004, the Secretary routinely *excluded* M+C [inpatient hospital] days from the Medicare fraction."   *Ne. Hosp.*, 657 F.3d at 15. The "actual practice was to not count the M+C days in the [Medicare] fraction prior to 2004." *Id.* (citation and internal quotation marks omitted).  It was not until 2007 that the Secretary even began to collect the data needed to include M+C days in the Medicare/SSI fraction.  *Id.*; *see* Change Request 5647, CMS Pub. 100-04, Transmittal No. 1331 (July 20, 2007).  The Secretary's excuse for this failure was "not convincing" to the D.C. Circuit, 657 F.3d at 15, just as her current excuses do not convince this Court.

### B.      Details of the Secretary's "About Face"

The Secretary's actions in 2003, 2004, and 2007 are the focal points of the parties' disputes.

### 1.      2003 NPRM

In 2003, in a notice of proposed rulemaking ("2003 NPRM") published in the Federal Register, the Secretary stated the following:

> We have received questions whether patients enrolled in an M+C Plan should be counted in the Medicare fraction or the Medicaid fraction of the DSH patient percentage calculation. The question stems from whether M+C plan enrollees are entitled to benefits under Medicare Part A since M+C plans are administered through Medicare Part C.

> We note that, under § 422.50, an individual is eligible to elect an M+C plan if he or she is entitled to Medicare Part A and enrolled in Part B. However, once a beneficiary has elected to join an M+C plan, that beneficiary's benefits are no longer administered under Part A.

> Therefore, we are proposing to clarify that once a beneficiary elects Medicare Part C, those patient days attributable to the

> beneficiary should not be included in the Medicare fraction of the DSH patient percentage. These patient days should be included in the count of total patient days in the Medicaid fraction (the denominator), and the patient's days for the M+C beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction.

Medicare Program, Proposed Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2004 Rates, 68 Fed. Reg. 27154, 27208 (May 19, 2003).

The proposed clarification was the last and shortest of eight proposed changes in a section entitled "Indirect Medical Education (IME) Adjustment (§ 412.105) and Disproportionate Share Hospital (DSH) Adjustment (§ 412.105)." *Id.* at 27201–08.

## 2.      Comments Received After 2003 NPRM

The public comments on the 2003 NPRM appear in the Rulemaking Record (R.R.), Dkt. 31, 33, 34, and are relatively sparse.  A small number of hospitals submitted comments, some of which were nearly identical, asserting that the proposal was "inconsistent" with the Medicare Act and urging that "M+C days continue to be treated as Medicare days in the DSH calculation." *See, e.g.*, Comment of North Shore University Hospital at Plainview, R.R. at 343; *see also* Comment of Association of American Medical Colleges, R.R. at 370–71 (arguing that Part C patients should be included in the Medicare/SSI fraction).  But a smaller number of commenters—the Secretary has identified only two, *see* Def. MSJ Mem., Dkt. 35, at 33—urged that the Secretary include Part C days in the Medicaid fraction.  *E.g.*, Comment of Mercy Health System, R.R. at 389–90.

Three other comments are particularly noteworthy.  One commenter, Southwest Consulting Associates, stated: "In our work with data from CMS [Centers for Medicare & Medicaid Services], it appears that the SSI fraction generally does not include Medicare HMO days[, . . . which were] inconsistently counted in the SSI fraction from provider to provider and

from year to year. . . . To count all indigent [patients] (the purpose of the calculation), we support the inclusion of Medicare HMO days in the Medicaid fraction."  R.R. at 140–41; *see also id.* at 147–49 (supplemental comment from same commenter arguing that "CMS's exclusion of [M+C] days from the Medicaid percentage . . . violates the plain language of the DSH provisions of the Medicare statute" and is inconsistent with "Congress' and the Secretary's readings of similar language in another Medicare payment area, as well as prior CMS policy").

Another commenter, a CMS contractor, expressed confusion over the 2003 NPRM.  *See* Comment of Cahaba Safeguard Administrators, LLC, R.R. at 516 ("We assume that the Medicare fraction refers to the SSI% used in the DSH patient percentage.  Is this a correct assumption?  Does the proposal mean that M+C days were included in the SSI% prior to this proposal, and will no longer be included in the SSI%?").  A third commenter observed:

> *Insufficient data is provided* in the proposed rule to make a rational evaluation of this proposal.  When a beneficiary elects M+C coverage, Medicare Part A no longer administers their benefits, but *Part A entitlement does not end*.  M+C plans also did not exist when the DSH formula was devised, and hove [sic] not been otherwise addressed by Congress in this regard.  So it is possible for CMS to support inclusion of these days in the Medicare fraction *or* in the Medicaid fraction, depending on the argument selected.  *We would like to see data on the effects (by provider number) of removing M+C days from the SSI percentage calculation*.

Comment of Memorial Healthcare System, R.R. at 354.

### 3.        2004 Final Rule

The Secretary did not adopt the proposed clarification.  Instead, in 2004, she changed course and announced the following, referred to in this opinion as the "2004 Final Rule":

> We have received questions whether the patient days associated with patients enrolled in an M+C Plan should be counted in the Medicare fraction or the Medicaid fraction of the DSH patient

percentage calculation. The question stems from whether M+C plan enrollees are entitled to benefits under Medicare Part A since M+C plans are administered through Medicare Part C.

We note that, under existing regulations at § 422.50, an individual is eligible to elect an M+C plan if he or she is entitled to Medicare Part A and enrolled in Part B. However, once a beneficiary has elected to join an M+C plan, that beneficiary's benefits are no longer administered under Part A.  In the proposed rule of May 19, 2003 (68 FR 27208), we proposed that once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary would not be included in the Medicare fraction of the DSH patient percentage. Under our proposal, these patient days would be included in the Medicaid fraction.   The patient days of dual-eligible M+C beneficiaries (that is, those also eligible for Medicaid) would be included in the count of total patient days in both the numerator and denominator of the Medicaid fraction.

Comment: Several commenters indicated that they appreciated CMS's attention to this issue in the proposed rule. The commenters also indicated that there has been insufficient guidance on how to handle these days in the DSH calculation. However, several commenters disagreed with excluding these days from the Medicare fraction and pointed out that these patients are just as much Medicare beneficiaries as those beneficiaries in the traditional fee-for-service program.

Response: Although there are differences between the status of these beneficiaries and those in the traditional fee-for-service program, we do agree that once Medicare beneficiaries elect Medicare Part C coverage, they are still, in some sense, entitled to benefits under Medicare Part A.  We agree with the commenter that these days should be included in the Medicare fraction of the DSH calculation. Therefore, we are not adopting as final our proposal stated in the May 19, 2003 proposed rule to include the days associated with M+C beneficiaries in the Medicaid fraction. Instead, we are adopting a policy to include the patient days for M+C beneficiaries in the Medicare fraction. As noted previously, if the beneficiary is also an SSI recipient, the patient days will be included in the numerator of the Medicare fraction. We are revising our regulations at § 412.106(b)(2)(i) to include the days associated with M+C beneficiaries in the Medicare fraction of the DSH calculation.

Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48916, 49099 (Aug. 11, 2004).

Despite the statement in the Federal Register that 42 C.F.R. § 412.106(b)(2) would be amended, no revised regulation was issued until 2007.

### 4.        2007 Changes to Regulations

In summer 2007, the Secretary issued what the agency characterized as a "technical correction" to the regulation regarding CMS's policy on Part C days.   Medicare Program; Changes to the Hospital Inpatient Prospective Payment System and Fiscal Year 2008 Rates, 72 Fed. Reg. 47130, 47384 (Aug. 22, 2007).   Specifically, the Secretary amended 42 C.F.R. § 412.106(b)(2) to define the numerator and denominator of the Medicare/SSI fraction to include patients who are "entitled to Medicare Part A (*or Medicare Advantage (Part C)*)."  *Id.* at 47411 (emphasis added).   The Secretary said that she had "inadvertently" failed to make this change earlier despite her 2004 "policy change." *Id.* at 47384.   The effective date for the 2007 rule was October 1, 2007, the beginning of federal fiscal year 2008.[5]  *Id.* at 47130.   The Secretary waived notice and comment for the 2007 regulatory-text amendment pursuant to 5 U.S.C. § 553(d)(3) because she viewed the amendment as a technical correction for the oversight of not having done so in 2004.[6]

CMS did not begin collecting all the data necessary to implement its new policy until 2007.   In Change Request 5647, CMS stated that "[p]atients who are enrolled in [Part C] . . . should also be included in the Medicare fraction."  Transmittal No. 1311 (July 20, 2007), *available at* https://www.cms.gov/transmittals/downloads/R1311CP.pdf at 8.       With an

---

[5] The Secretary further amended 42 C.F.R. § 412.106(b)(2)(i)(B) and (iii)(B) in 2010 to use the word "including" in place of "or," in an apparent attempt to bolster further her position.   The relevant language presently in place for both the numerator and denominator of the Medicare/SSI fraction is "entitled to . . . Medicare Part A (*including* Medicare Advantage (Part C))." *Id.* (emphasis added).

[6] The validity of the waiver is not directly at issue in this case because the parties' arguments focus on the notice given by the 2003 NPRM and the explanation given in the 2004 Final Rule.

implementation date of January 7, 2008 and a purported "effective date" of October 1, 2006, the change request directed that "hospitals . . . begin to submit 'no pay' bills to their Medicare contractor for the [Part C] beneficiaries they treat, in order for these days to be *eventually* captured in the DSH . . . calculations." *Id.* at 1 (emphasis added). As stated in the transmittal, CMS's goal was to include the Part C days in the Medicare/SSI fraction "starting with federal FY 2007." *Id.* at 2. CMS revised the Medicare Claims Processing Manual to reflect this goal: "[H]ospitals may go back and submit claims with discharge dates on or after October 1, 2006 (FY 2007), *so that SSI data for FY 2007 and beyond will include [Part C] patient days*." *Id.* (emphasis added); *see also* Medicare Claims Processing Man. (CMS Pub. 100-04), ch. 3, § 20.3, *available at* http://www.cms.gov/manuals/downloads/clm104c03.pdf (requiring hospitals to submit informational only bills to "ensure that these days are included in the SSI [fraction] for Fiscal Year 2007 and beyond").

On March 6, 2009, CMS issued Transmittal No. 1695, in which it expanded and strengthened its previously stated policy that providers "*may* go back and submit claims with discharge dates on or after October 1, 2006," *see* Change Request 5647 at 2 (emphasis added), and now *required* all hospitals that received DSH payments in FY 2006 to submit claims for those Part C days for discharges on or after October 1, 2005: "Non-teaching IPPS hospitals that received Medicare DSH payments in FY 2006 . . . must submit claims for [Part C] patients with discharge dates on or after October 1, 2005 through September 30, 2006 (FY 2006), in order to ensure that Medicare DSH calculations for FY 2006 accurately reflect [Part C] inpatient days." *See* Change Request 6329, Transmittal No. 1695 (March 6, 2009), *available at* https://www.cms.gov/transmittals/downloads/R1695CP.pdf.

### C.        Procedural History of the Hospitals' Claims

Private insurance companies, known as "fiscal intermediaries," act on the Secretary's behalf to process payments to qualifying hospitals and other providers of medical services.  42 C.F.R. §§ 421.1, 421.3, 421.100–.128.  These intermediaries calculate a provider's DSH adjustment by determining the Medicare and Medicaid fractions.  A hospital aggrieved by an intermediary's calculation can appeal to the Provider Reimbursement Review Board (PRRB). *See* 42 U.S.C. § 1395oo; 42 C.F.R. §§ 405.1807, 405.1835.  The PRRB's determination as to an appeal is considered the final agency action unless the Secretary, on her own motion, reverses, affirms, or modifies that decision.  42 U.S.C. § 1395oo(f)(1).  The Secretary has authorized the Administrator of CMS to act on her behalf in reviewing the PRRB's decisions; therefore, the Administrator's review of a PRRB ruling is considered the final decision of the Secretary.  *See* 42 C.F.R. § 405.1875.  A hospital has the right to seek judicial review in federal district court of any final decision by the Board or the Secretary.  42 U.S.C. § 395oo(f)(1).

The Hospitals, dissatisfied with intermediaries' inclusion of Part C days in the Medicare/SSI fraction for FY 2007, sought PRRB review.  Pl. MSJ Mem. [Dkt. 32–1] at 11.  The PRRB denied relief and granted expedited judicial review; the parties timely filed in this Court.[7] *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

---

[7] Two other cases, both captioned *Florida Health Sciences Center, Inc. v. Sebelius*—civil actions number 10-1462 and number 12-328—were consolidated with this case, civil action number 10-1463.  The PRRB granted expedited judicial review to the plaintiffs in this case in the first instance.  *See* A.R. 6–12, 1185–91.  In 2010, the PRRB denied expedited judicial review to the plaintiffs in the *Florida Health Sciences Center* cases, but, in 2012, concluded that expedited judicial review was appropriate.  *See* Consent Motion to Consolidate, [Dkt. 7], Civ. No. 12-328. The Court has consolidated all three cases.  Order, [Dkt. 10], Civ. No. 10-1463; Minute Order Dated April 30, 2012, Civ. No. 12-328.  The parties agree that the three cases are ripe for decision, raise no procedural issues, and present the identical issue of whether the Secretary's inclusion of Medicare Part C days in the Medicare/SSI fraction in FY 2007 was proper. Accordingly, the Court's analysis of that issue is dispositive of all three cases.

**D.      Related Litigation Over 2004 Policy Change; Impact on this Case**

As mentioned above, this case's history is intertwined with that of *Northeast Hospital*, which presented issues related to the ones in this case.

On March 29, 2010, another judge of this Court, the Honorable John Bates, held that the Secretary's inclusion of the Medicare Part C days in the Medicare/SSI fraction for fiscal years 1999–2002 failed under *Chevron* steps one and two.[8]  *See Ne. Hosp. Corp. v. Sebelius*, 699 F. Supp. 2d 81, 92–95 (D.D.C. 2010), *aff'd on limited grounds*, 657 F.3d 1 (D.C. Cir. 2011). The Hospitals sought a preliminary injunction against the Secretary in this case based on the Judge Bates's ruling, Dkt. 12, and the Secretary filed a motion to stay these proceedings while the D.C. Circuit ruled on her appeal, Dkt. 7.   By Memorandum Opinion and Order dated December 22, 2010, this Court denied the Hospitals' motion and granted the Secretary's motion to stay, concluding that "despite the fact that some measure of irreparable injury might result to the Hospitals until the D.C. Circuit render[ed] its decision . . . the balance of the equities and the harm [an injunction] would cause to the public interest" weighed in favor of awaiting an appellate ruling in *Northeast Hospital*.  *See Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 71 (D.D.C. 2010).

In 2011, the D.C. Circuit issued its ruling, concluding first that the Medicare statute did not "unambiguously foreclose the Secretary's interpretation" of the DSH calculation for the purposes of a *Chevron* step one analysis.  *Ne. Hosp.*, 657 F.3d at 11, 13 ("Congress has not clearly foreclosed the Secretary's interpretation that M+C enrollees are entitled to benefits

---

[8] Under the two-step analysis of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, the Court first determines "whether Congress has directly spoken to the precise question at issue." 467 U.S. 837, 842 (1984).  "[I]f the statute is silent or ambiguous" on that question, then the Court defers to the agency's interpretation if it is "based on a permissible construction of the statute."  *Id.* at 843.

under Part A. Rather, it has left a statutory gap, and it is for the Secretary, not the court, to fill

that gap.") (citation omitted).   The D.C. Circuit did not reach the second step of *Chevron*,

whether the Secretary's interpretation was reasonable, "because even if the Secretary's present

interpretation is reasonable, it cannot be applied retroactively to fiscal years 1999–2002." *Id.* at

13.

      The D.C. Circuit firmly rejected the Secretary's argument that her post-2004

interpretation of the DSH calculation merely "codified a longstanding policy" because her pre-

2004 practice was not to count Part C days in the Medicare/SSI fraction. *Id.* at 15.   Finding that

the Secretary's "actual treatment of M+C days" prior to 2004, as well as "her statements in the

2004 rulemaking and in [the] subsequent 2007 technical revision," belied her claim that her

inclusion of Part C days with Part A days was "longstanding," *id.* at 16, the D.C. Circuit

concluded:

> [I]t is apparent that the Secretary's decision to apply her present
> interpretation of the DSH statute to fiscal years 1999–2002 violates
> the rule against retroactive rulemaking.   The Secretary's
> interpretation, as set forth in the 2004 rulemaking and resulting
> amendment to § 412.106, contradicts her former practice of
> excluding M+C days from the Medicare fraction. Moreover, the
> amendment attaches new legal consequences to hospitals'
> treatment of low-income patients during the relevant time period.

*Id.* at 16–17.

      Judge Kavanaugh, in a concurring opinion, agreed with the district court's

analysis in *Northeast Hospital* and would have held that 42 U.S.C. § 1395ww(d)(5)(F)(vi)

unambiguously foreclosed the Secretary's proffered interpretation at step one of the *Chevron*

analysis.   *Id.* at 24 (Kavanaugh, J., concurring) ("[D]espite HHS's effort to fog it up,

§ 1395ww(d)(5)(F)(vi) is sufficiently clear in establishing that a Part C beneficiary is not

simultaneously entitled to benefits under Part A for any specific patient day.").   Moreover, Judge

Kavanaugh agreed with the majority in rejecting the Secretary's argument that her post-2004 interpretation of the statute was consistent with longstanding practice. *Id.* at 21 ("[I]t is quite telling that, until 2004, HHS itself interpreted the statute as the Hospital does here. In 2004, HHS abruptly changed course, apparently because of an overriding desire to squeeze the amount of money paid to Medicare providers (and beneficiaries) in light of the country's increasingly precarious fiscal situation.").

The parties completed briefing after the D.C. Circuit issued its ruling in *Northeast Hospital*, and the case is now ripe for decision.

## II.    LEGAL STANDARD

Three legal standards are applicable in this case: (1) the general standard of review for summary judgment in cases under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; (2) the standard for the notice and comment required of the Secretary in rulemaking under the APA and the Medicare Act; and (3) the standard governing the Hospitals' claim that the Secretary's interpretation of the DSH calculation was insufficiently explained and thus arbitrary and capricious in violation of the APA.[9]

### A.    Standard of Review for Summary Judgment in APA Cases

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "In a case involving review of a final agency action under the [APA], 5 U.S.C. § 706, however, the standard set forth in Rule 56[] does not apply because of the limited role of a court in reviewing the administrative record."  *Sierra Club*

---

[9] As set forth more fully below, the Hospitals advanced other claims that the Court need not reach to dispose of the pending motions.

*v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006); *see also Charter Operators of Alaska v. Blank*, 844 F. Supp. 2d 122, 126–27 (D.D.C. 2012); *Buckingham v. Mabus*, 772 F. Supp. 2d 295, 300 (D.D.C. 2011).   Under the APA, the agency's role is to resolve factual issues to reach a decision supported by the administrative record, while "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."   *Sierra Club*, 459 F. Supp. 2d at 90 (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985) (internal quotation marks omitted)). "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."   *Id.* (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

## B.      Notice & Comment—APA and the Medicare Act

Under the APA and the Medicare Act, the Secretary must provide the public with adequate notice of a proposed rule and an opportunity to comment thereon.   *See* 5 U.S.C. § 553(b)–(c) (APA); 42 U.S.C. § 1395hh(b)(1) ("[B]efore issuing in final form any regulation . . . the Secretary shall provide for notice of the proposed regulation in the Federal Register and a period of not less than 60 days for public comment thereon."); 42 U.S.C. § 1395hh(a)(2) ("No rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services . . . shall take effect unless it is promulgated by the Secretary by regulation under [42 U.S.C. § 1395hh(a)(1)].").

"Notice requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review."   *Int'l Union, UMWA v. MSHA*, 407

F.3d 1250, 1259 (D.C. Cir. 2005).  An agency may promulgate a final rule that is different from a proposed rule, but only if the final rule is a "logical outgrowth" of the proposed rule, *i.e.*, only if "interested parties 'should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'"  *Id.* (quoting *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004)); *accord* 42 U.S.C. § 1395hh(a)(4) ("If the Secretary publishes a final regulation that includes a provision that is not a logical outgrowth of a previously published notice of proposed rulemaking or interim final rule, such provision shall be treated as a proposed regulation and shall not take effect until there is the further opportunity for public comment and a publication of the provision again as a final regulation.").  Thus, neither a brand-new rule nor one built on vague insinuations for which an interested party would have had to "divine [the Agency's] unspoken thoughts" will qualify as a "logical outgrowth."  *See Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000); *Int'l Union, UMWA*, 407 F.3d at 1260.

### C.      The APA's Prohibition Against Arbitrary & Capricious Agency Action

The Hospitals' claim that the Secretary's rulemaking was insufficiently explained falls under the APA's prohibition against arbitrary and capricious agency action.  The APA provides that a reviewing court may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  At the same time, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) ("The requirement that agency action not be arbitrary or capricious includes a requirement that the agency adequately explain its result."). While the agency action under review is "entitled to a presumption of regularity[,] . . . that presumption is not to shield [an] action from a thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

"An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." *INS v. Cardoza-Fonesca*, 480 U.S. 421, 446 n.30 (1987) (internal quotation marks and citation omitted); *see also Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."). "One of the core tenets of reasoned decision-making is that an agency [when] changing its course . . . is obligated to supply a reasoned analysis for the change." *See Republic Airline Inc. v. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) (internal quotation marks and citations omitted). "Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action." *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (internal quotation marks and citation omitted).

## III. ANALYSIS

The Hospitals challenge the Secretary's 2004 policy change on a number of procedural and substantive grounds. Procedurally, the Hospitals assert, the Secretary: (1) provided inadequate opportunity for notice and comment in violation of the APA and the

Medicare Act; (2) failed to explain the reasons behind the policy change, in violation of the APA; and (3) provided insufficient financial analysis of the proposed change in violation of the Regulatory Flexibility Act.   The Hospitals also make two substantive challenges to the Secretary's policy.   First, arguing that the D.C. Circuit's conclusion to the contrary in *Northeast Hospital* is dictum that does not bind this Court, they contend that the 2004 policy change fails the first step of *Chevron* because the Medicare statute precludes the interpretation assigned by the Secretary.   Second, the Hospitals ask the Court to invalidate the Secretary's interpretation under the second step of *Chevron* as unreasonable.

As set forth below, the Court agrees with the Hospitals as to the first two of their procedural arguments.   Because these conclusions require vacatur and remand of this matter to the Secretary, the Court does not reach the Hospitals' other arguments.

Before reaching these matters, however, the Court must address briefly a threshold matter.   Many of the Secretary's arguments rely on the factual premise that her post-2004 interpretation did not constitute a change in policy.   The D.C. Circuit held otherwise in *Northeast Hospital*, and the Court need not dwell on that issue at length.

### A.      The Secretary's 2004 Policy Change

The Secretary takes the position in this case that the 2004 rulemaking did not constitute a policy change because her policy has always been to include Part C days in the Medicare/SSI fraction.   *E.g.*, Def. MSJ Mem. at 28 ("On a factual level, plaintiffs' claim that the 2004 rule was an unexplained departure from a long-established interpretation is little more an *ipse dixit*, entirely without basis.").   She concedes that CMS had failed "to specifically address the intersection between the DSH calculation and Medicare Part C," which "had left interested parties with questions about how M+C days were to be counted" and that "[t]here may even have

been some variation in how these days had been being handled from one hospital and fiscal intermediary to the next." *Id.* at 30 (citations omitted).   However, the Secretary insists that, based on a 1990 rulemaking statement, "the Secretary had a policy of 'including HMO days in the SSI/Medicare percentage,'" which was a "longstanding inclusion" that "Congress must be presumed to have been aware of when it enacted Part C" in 1997.  *Id.* at 22 (citing Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1991 Rates, 55 Fed. Reg. 35990, 35994 (Sept. 4, 1990)); Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1997 Rates, 61 Fed. Reg. 46166, 46207 (Aug. 30, 1996)).  *Northeast Hospital* is not dispositive, the Secretary argues in a footnote, because "the Court of Appeals found that CMS had a prior '*practice* of excluding M+C days from the Medicare fraction.' . . . [But] a de facto practice is quite different from an official agency policy.  Moreover, the *Northeast* court did not find—nor was it the case—that CMS had either a policy *or* practice of counting M+C days in the Medic*aid* fraction."  Def. MSJ Mem. at 30 n.11 (citations omitted).

The Hospitals cry foul, and with good reason.  "The Secretary's factual premise," they argue, "has been rejected by binding Circuit precedent [in *Northeast Hospital*] . . . [and] is 'unacceptable non-acquiescence' in the law of this Circuit."  Pl. Opp'n Mem. [Dkt. 38] at 4 (quoting *Hosp. of Univ. of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 139 (D.D.C. 2012)).  The Hospitals assert that the Secretary's attempts to distinguish between agency policy and practice, as well as between appellate findings about the Medicare/SSI fraction versus the Medicaid fraction, offer no basis to remove the case from the scope of *Northeast Hospital*.  *Id.* at 6–9.

The plain text of the D.C. Circuit's opinion undercuts the Secretary's position. That Court's evaluation—that "[a] brief look at the Secretary's treatment of M+C days prior to

2004 . . . belies her claim that the revision to § 412.106 codified a longstanding policy," *Northeast Hospital*, 657 F.3d at 15—is unequivocal and inescapable.   Nor did *Northeast Hospital* give room for a legally significant difference between practice and policy.   In fact, the appellate court went to pains to state the opposite, rejecting the Secretary's attempt to rely on the 1990 rulemaking.   *Id.* at 16 ("Aside from the Secretary's actual treatment of M+C days, her statements in the 2004 rulemaking and in a subsequent 2007 technical revision confirm that she changed her interpretation of the DSH provision in 2004."); *see also id.* (discussing how the Secretary "called her 2004 decision to include M+C days in the Medicare fraction a 'policy change'" (quoting 72 Fed. Reg. at 47384)).   *Northeast Hospital* also rejected any distinction between policy regarding the Medicare and Medicaid fractions, making the common-sense observation that the interpretation of the two is tied because a patient is either "entitled" or "not entitled" to Part A benefits and thus necessarily falls in one fraction or the other.   *Id.*

Accordingly, in addressing the Hospitals' arguments as to whether the Secretary's 2004 interpretation of the DSH calculation can be applied to calculate FY 2007 reimbursement rates, the Court begins with the proposition that "[t]he Secretary's interpretation [of the DSH calculation], as set forth in the 2004 rulemaking and resulting amendment to § 412.106, contradicts" and is a "substantive departure" from "her former practice of excluding M+C days from the Medicare fraction."   *Ne. Hosp.*, 657 F.3d at 17.

## B.   Notice & Comment—APA and the Medicare Act

The Court turns first to the Hospitals' argument that the Secretary violated both the APA, 5 U.S.C. § 553, and the Medicare Act, 42 U.S.C. § 1395hh, by failing to provide notice that she was changing her interpretation to include Part C days in the Medicare/SSI fraction. According to the Hospitals, "the Secretary clarified one policy in 2003, then announced the

inverse of that policy in 2004, without notice and comment and without amending the DSH regulation as necessary to effectuate the new rule. . . . Then, in August 2007, she amended the regulation without advance notice or comment to implement the [2004] policy change. . . . Two years later, the Secretary attempted to implement the new policy for the [2006 fiscal year] through further instructions issued in 2009 . . . ." Pl. MSJ Mem. at 17–18.

### 1.     Parties' Arguments

The parties' arguments as to the sufficiency of prior notice center on the effectiveness of the 2003 NPRM. According to the Secretary, she satisfied her duty to "fairly apprise[] [the] interested parties of the issues involved" because the 2003 NPRM identified the issue—whether Part C enrollees should be counted in the Medicare/SSI fraction or the Medicaid fraction—and there were only two possible outcomes. Def. MSJ Mem. at 36–37 (citing *Nuvio Corp. v. FCC*, 473 F.3d 302, 310 (D.C. Cir. 2006)). The fact that the Secretary settled in 2004 on including Part C subscribers in the Medicare/SSI fraction as opposed to the Medicaid fraction, as she suggested in 2003 NPRM, is of no matter because the 2004 rule was a "logical outgrowth" of the 2003 NPRM. *Id.* at 36 (citing *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 951). The comments received in response to the 2003 NPRM bear this out, the Secretary asserts, because they show that reasonable parties understood that she was proposing two options in the 2003 NPRM from which she would select one. Def. MSJ Mem. at 39–40 (citing *Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998)); *see also* Def. Reply [Dkt. 40] at 14.

The Hospitals respond that the 2003 NPRM "gave no reason to conclude that when she was clarifying her old policy, the Secretary was actually proposing to adopt its inverse." Pl. MSJ Mem. at 19. They claim that the 2003 NPRM was insufficient to put them on notice that the Secretary would announce "a new policy in 2004 that was diametrically opposed

to the policy clarified in 2003." *Id.* Thus, according to the Hospitals, the 2004 interpretation cannot have been a "logical outgrowth" of the 2003 proposal. *Id.* at 19–20. The Hospitals also rely on the manner in which the Secretary phrased the 2003 notice, observing that the notice did not propose any change to the regulatory text and did "not state that the Secretary planned to *determine*" the answer to this issue—it stated that the agency "had '*received questions*.'" Pl. Opp'n Mem. at 10 (quoting 68 Fed. Reg. at 27208) (first emphasis added by Court, second by Plaintiffs). Accordingly, "[t]he agency did not identify any proposed change in policy because the Secretary was merely clarifying the policy and practice the agency had been following since [P]art C was enacted in 1997, which comported with her 1986 policy that 'entitled to benefits under part A' means paid under the part A payment system.'" *Id.* at 11 (citation omitted).

## 2.      Analysis

The Court concludes that the Secretary's interpretation of the fractions in the DSH calculation, announced in 2004 and not added to the Code of Federal Regulations until the summer of 2007, was not a "logical outgrowth" of the 2003 NPRM. *See Int'l Union, UMWA*, 407 F.3d at 1259. The rulemaking procedure was flawed due to both the single-minded way the NPRM presented the issue and the fact that the Secretary adopted the polar opposite of the original proposal. Contrary to the Secretary's argument, the comments do not remedy these deficiencies.

First, the text of the 2003 NPRM was not written in a way that "interested parties 'should have anticipated' that the change was possible[] and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 952 (citing, *inter alia*, *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003); *see also Small Refiner Lead Phase-Down Task Force v. U.S. E.P.A.*, 705 F.2d 506, 549

(D.C. Cir. 1983) ("Agency notice must describe the range of alternatives being considered with reasonable specificity.").   The 2003 NPRM, consisting of three paragraphs and nowhere proposing any amendment to the C.F.R., stated that the Secretary had "received questions" and was "proposing to clarify" that Part C patients should be counted in the Medicaid fraction.  68 Fed. Reg. at 27508.   Leaving aside the Secretary's failure to acknowledge explicitly her longstanding practice, discussed above, the NPRM does not support the Secretary's characterization of the issue as an open, binary choice between two equally valid interpretations.  To the contrary, the 2003 NPRM firmly slants toward inclusion of Part C patients in the Medicaid fraction.  The second paragraph reasons that, although "an individual is eligible to elect an M+C plan if he or she is entitled to Medicare Part A and enrolled in Part B[,] . . . once a beneficiary has elected to join an M+C plan, that beneficiary's benefits are no longer administered under Part A."   *Id.*   The NPRM then immediately segues: "Therefore, we are proposing to clarify that once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage."   *Id.*   The Secretary did not ask for comment on whether her interpretation was consistent with the statute or what the practical impact of the proposed interpretation might be.  The 2003 NPRM reads more like an afterthought of a clarification than a proposed rule susceptible of multiple interpretations.

Second, even setting aside its semantic issues, the 2003 NPRM is problematic because the Secretary adopted the exact opposite interpretation from the one she proposed.  While this is not a *per se* death knell for a proposed rule, given the 180-degree shift, this is not a case in which "any reasonable party should have understood that [the Secretary] might reach the opposite conclusion after considering public comments," and the mere passing mention of the

alternative, in the context of this specific notice, does not overcome the NPRM's weaknesses. *See Ariz. Pub. Serv. Co.*, 211 F.3d at 1230.   The parties argue at length about whether *Environmental Integrity Project v. EPA*, 425 F.3d 992 (D.C. Cir. 2005), dictates the conclusion that notice was invalid.   *See* Pl. Opp'n Mem. at 12–13, Def. MSJ Mem. at 38–39, Def. Reply at 13.   In that case, the EPA gave notice that it proposed to delete certain language from a prefatory paragraph in the C.F.R. to clarify, as it had held in two administrative proceedings, that two emissions regulations operated independently and, thus, parties needed to obtain permits complying with both regulations on a case-by-case basis.   *Envtl. Integrity Project*, 425 F.3d at 994–95.   In the final rule, however, the EPA "switched course and adopted the opposite position," concluding that the regulations operated dependently such that permits meeting one regulation would meet the other.   *Id.* at 995.   The D.C. Circuit, reasoning that the term "logical outgrowth" did "not include the [EPA's] decision to repudiate its proposed interpretation and adopt its inverse," concluded that the EPA violated the notice-and-comment requirement.   *Id.* at 998.

        The Secretary seeks to avoid *Environmental Integrity Project*, arguing that it involved "minor amendments" to "conform" regulations "to an existing regulatory interpretation that the agency had adopted through prior adjudications," while rulemaking in the instant matter involved "how best to interpret an ambiguous provision."   Def. MSJ Mem. at 38.   This understates the holding of *Environmental Integrity Project* and ignores, yet again, the Secretary's longstanding "former practice of excluding M+C days from the Medicare fraction."   *Ne. Hosp.*, 657 F.3d at 17.   To be sure, a *de facto* practice is not quite as strong as the administrative opinions at issue in *Environmental Integrity Project*.   But the slate is not blank as the Secretary claims, making this case far more like *Environmental Integrity Project* and others in which

agencies "use the rulemaking process to pull a surprise switcheroo on regulated entities." 425 F.3d at 996 (giving as an example *Int'l Union, UMWA v. MSHA*, 407 F.3d 1250 (D.C. Cir. 2005)).

Finally, the Secretary points to the comments she received as evidence that the 2003 NPRM sufficiently put the public on notice of the "subjects and issues involved," 5 U.S.C. § 553(b)(3).   Def. MSJ Mem. at 39–40.   But an agency cannot "bootstrap notice from a comment," which is exactly what the Secretary is trying to do here.   *See Fertilizer Inst. v. U.S. E.P.A.*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (citing *Small Refiner Lead Phase-Down Task Force*, 705 F.2d at 549); *see also Nat'l Ass'n Psych. Health Sys. v. Shalala*, 120 F. Supp. 2d 33, 40 (D.D.C. 2000) ("[T]he adequacy of notice cannot be judged by the number and type of comments in response to the NPRM.").   As the Secretary notes, Def. Reply at 14, some of the commenters understood the import of the 2003 NPRM and either supported or opposed it, and some of the Hospitals even argued in favor of the interpretation they now challenge.   *E.g.*, R.R. at 343 (Comment of North Shore University Hospital at Plainview).   But the shortcoming in the Secretary's argument is that the comments—which are, at any rate, limited in number—is that, taken as a whole, they reflect confusion and misunderstanding.   *E.g.*, R.R. at 516.   The very comment from North Shore University-Plainview, which the Secretary claims "cannot assert with a straight face that [it was] denied an opportunity to voice [its] objection," Def. Reply at 14, misstated the Secretary's pre-2004 practice, describing the 2003 NPRM as a "change" rather than a codification.   *See id.*   ("[The proposal] would *remove M+C days from the Medicare day count*." (emphasis added)).   In light of the lack of clarity reflected by the comments, the Hospitals should not be estopped from arguing that Part C patients belong in the Medicaid fraction; instead, the Secretary must be accountable for the confusion that her "administrative

law shell game" has engendered.  *See Am. Tel. & Tel. Co. v. F.C.C.*, 978 F.2d 727, 732 (D.C. Cir. 1992).

For the foregoing reasons, the Court concludes that the 2003 NPRM did not provide adequate notice of the interpretation of the DSH fraction adopted by the Secretary in 2004 in violation of the APA and the Medicare Act.  The Court cannot say that the Hospitals, "'*ex ante*, should have anticipated that such a requirement might be imposed.'"  *Ariz. Pub. Serv. Co.*, 211 F.3d at 1299 (quoting *Aeronautical Radio, Inc. v. FCC*, 928 F.2d 428, 445–46 (D.C. Cir. 1991)).

Having concluded that the 2003 NPRM was procedurally defective, the Court need not address the Hospitals' alternative argument that the Secretary's responses to the submitted comments were insufficient under the APA; that issue is better addressed in the context of whether the Secretary's action was arbitrary and capricious, discussed below.[10] Moreover, the Court need not dwell on the Secretary's contention that "even if plaintiffs were to show that the Secretary failed to provide notice, they have not shown that the failure resulted in prejudice," and thus there was no notice-and-comment violation.  Def. MSJ Mem. at 40.  The confusion over the Secretary's interpretation of the DSH calculation and large amount of money at stake meet the "not . . . particularly robust showing of prejudice" courts require in these cases. *See Chamber of Commerce of U.S. v. S.E.C.*, 443 F.3d 890, 904 (D.C. Cir. 2006) (citing, *inter alia*, *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002)).  In addition, as the Secretary acknowledged in both the 2003 NPRM and 2004 Final Rule, 42 U.S.C. § 1395ww(d)(5)(F)(vi) is susceptible to multiple interpretations; the APA and Medicare Act

---

[10] That having been said, it is telling that the Secretary neither directly acknowledged the confusion reflected in the comments nor responded to the detailed comment asserting that the 2003 NPRM's explanation was too cursory.  *See* 69 Fed. Reg. at 49099 (discussing comments received in response to 2003 NPRM).

require that the Hospitals have a chance to understand what was at stake in the Secretary's proposal and weigh in.

## C.     The APA's Prohibition Against Arbitrary & Capricious Agency Action

The Court turns next to whether the Secretary's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), due to her alleged failure to "articulate a satisfactory explanation" for her 2004 policy change.[11]  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  The Court thus reviews the record of the 2004 rulemaking to determine if the Secretary has supplied a "reasoned analysis for the change." *Republic Airline, Inc.*, 669 F.3d at 299.

### 1.     Parties' Arguments

The Hospitals argue that the explanation offered by the Secretary is flawed in two ways: it failed to acknowledge that she was changing from her prior interpretation, and it failed to give a reason for the departure.  Pl. MSJ Mem. at 24–26.  According to the Hospitals, the only explanation the Secretary offered for the 2004 change is that Part C enrollees are "still, in some sense, entitled to benefits under Medicare Part A," which is a "vacuous utterance [that] explains nothing" and is "entirely devoid of genuine reasoning." *Id.* at 25.  The Secretary's explanation is fatally conclusory, the Hospitals contend, because she "did not explain why part C days, which are not paid under the part A prospective payment system, should suddenly start to be reflected in a DSH formula designed by Congress to adjust part A payments to account for services to low-income part A patients." *Id.* at 24.  Moreover, because "[t]here is no reference to Medicare provisions outside of the DSH calculation, no examination of congressional purpose in enacting

---

[11]  The Secretary asserts that she "cannot be faulted for failing to acknowledge a 'prior established interpretation' that she did not have." Def. MSJ Mem. at 28 (citation omitted).  The Court follows *Northeast Hospital* and declines to engage in semantic debates about what, in fact, the Secretary's pre-2004 position should be called.

the Part C program, [] no invocation of 'sound policy' reasons for the change," and no explanation of "the inconsistency with the Secretary's other interpretation of the very same word 'entitled' in the very same sentence of the Medicare DSH statute." *Id.*

      The Secretary responds that her explanation in the 2004 Federal Register was adequate because she explained that "an individual is eligible to elect an M+C plan only 'if he or she is entitled to Medicare Part A,' and that 'each M+C plan must provide coverage of all services that are covered by Medicare Part A.'" Def. MSJ Mem. at 27–28. When the Secretary said "still, in some sense, entitled to benefits under Part A," "it was obvious in what 'sense' the Secretary meant—namely, in the sense that the phrase is employed as a term of art in the DSH provision.'" *Id.* at 28. According to the Secretary, her explanation was sufficient because she provided a "basic indication of why the agency chose to do what it did." *Id.* (citing, *inter alia*, *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 669 (D.C. Cir. 2009)).

### 2.      Analysis

      The Court concludes that the Secretary's cursory explanation in the 2004 Final Rule failed to meet the requirements of the APA. The Secretary argues extensively that her alleged failure to acknowledge her pre-2004 practice has no bearing on whether the post-2004 practice was adequately explained, *e.g.*, Def. Reply at 20, but this argument is flawed from both legal and logical standpoints. It is true, as the Secretary notes, that there is no "heightened standard of review when examining the reasoning behind a change in policy." Def. MSJ Mem. at 27 (citing *FCC v. Fox Television Stations*, 556 U.S. 502 (2009)). But *Fox* itself makes clear that a policy change is relevant to the Court's inquiry in run-of-the-mill cases: "[T]he requirement that an agency provide reasoned explanation for its action would *ordinarily demand that it display awareness that it is changing position*." 556 U.S. at 515 (emphasis added).

In fact, this case falls squarely within the admonition in *Fox* that, when an agency's "prior policy has engendered serious reliance interests," an agency "must" give "a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* (citing *Smiley v. Citibank (South Dakota), N. A.*, 517 U.S. 735, 742 (1996)). "It would be arbitrary or capricious to ignore such matters." *Id.* The closest the Secretary came to acknowledging her policy change in the meager explanation of the 2004 Final Rule was the statement that "commenters . . . indicated that there has been insufficient guidance on how to handle these days in the DSH calculation." 69 Fed. Reg. at 49099. This statement, by which the Secretary herself did not admit regulatory confusion but intimated that it was only commenters who believed it to exist, fell woefully short of owning up to, and explaining her decision to vary from, "longstanding practice."

Even setting aside the Secretary's failure to acknowledge her "about-face," *Northeast Hospital*, 657 F.3d at 15, her reasoning for the change was brief and unconvincing. There were only two portions of the statement accompanying the 2004 Final Rule that can fairly be described as an explanation. The first was a summary of the comments favoring inclusion of Part C days in the Medicare/SSI fraction: "[S]everal commenters . . . pointed out that these patients are just as much Medicare beneficiaries as those beneficiaries in the traditional fee-for-service program." 69 Fed. Reg. at 49099. The second was the Secretary's own rationale, which was limited to a single sentence: "Although there are differences between the status of these beneficiaries and those in the traditional fee-for-service program, we do agree that once Medicare beneficiaries elect Medicare Part C coverage, they are still, in some sense, entitled to benefits under Medicare Part A." *Id.* This statement contained no "reasoned explanation," *Cnty. of Los Angeles*, 192 F.3d at 1021; it merely restated the very same problem being fought over in

this case: in some sense, Part C enrollees are still "entitled to" Part A benefits—but, in another sense, they are not because a patient cannot be paid Part A benefits and Part C benefits at the same time. *See Ne. Hosp.*, 657 F.3d at 19–20 (Kavanugh, J., concurring) ("'[P]ayments under a contract with a Medicare+Choice organization . . .[,] with respect to an individual electing a Medicare+Choice plan offered by the organization[,] shall be instead of the amounts which (in the absence of the contract) would otherwise be payable under [Medicare] parts A and B.'" (quoting 42 U.S.C. § 1395w–21(i)(1)).

The Secretary contends that, under *Fox*, "where an agency changes its policy, 'it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better . . . .'" Def. Reply at 19 (quoting 556 U.S. at 515). That is true. But "the agency must *show* that there are good reasons for the new policy." *Fox*, 556 U.S. at 515 (emphasis added). One comment to the 2003 NPRM noted two of the subjects the Secretary neglected to address in the 2004 Final Rule: the need to reconcile Congressional intent regarding the DSH fraction and the M+C program, which were enacted years apart, and the financial impact of counting Part C days in the Medicaid fraction.[12] *See* R.R. at 354. There are other topics that the Secretary might have addressed, such as the logistics of implementing the Secretary's new method of calculation (which, the record shows, took years) and how regulated entities should reconcile the possibility of two different definitions of the word "entitled" in the same sentence in 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). These are subjects that the Secretary has confronted in this case, *e.g.*, Def. MSJ Mem. at 15–21 (arguing why the Secretary's interpretation was reasonable), as well as in *Northeast Hospital*. But the Secretary should have wrestled with those issues earlier and then shown at least some of her work in her

---

[12] As discussed earlier, this commenter, like others, believed the Secretary had been including Part C days in the Medicare/SSI fraction.

explanation of the 2004 Final Rule.  *See Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006)

("[P]ost hoc rationalizations 'have traditionally been found to be an inadequate basis for review'

of agency decisions." (quoting *Citizens to Pres. Overton Park*, 401 U.S. at 419)).

  "[A]n agency must cogently explain why it has exercised its discretion in a given

manner." *Motor Vehicles Ass'n*, 463 U.S. at 48 (citations omitted).  In this case, the Secretary

failed to do so and "depart[ed] from a prior policy *sub silentio*," *Fox*, 556 U.S. at 515, thus acting

arbitrary and capriciously in violation of the APA, 5 U.S.C. § 706(a)(2).

### D. Remedy

  "[T]he law of this circuit" governing remedies in cases involving flawed agency

actions is the *Allied-Signal* test.  *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C.

Cir. 2009) (*citing Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C.

Cir. 1993)).[13]   In determining whether to vacate the flawed agency action or leave it in place

pending remand, "the district court should be guided by two principal factors: (1) 'the

seriousness of the . . . deficiencies' of the action, that is, how likely it is 'the [agency] will be

able to justify' its decision on remand; and (2) 'the disruptive consequences of vacatur.'"  *Id.*

(quoting *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048-49, *modified on reh'g on*

*other ground*, 293 F.3d 537 (D.C. Cir. 2002)).   Here, both factors weigh in favor of vacatur.

This Court need not decide now whether the Secretary's post-2004 interpretation would pass

muster under *Chevron* step two if the proper procedure were followed and if the decision were

sufficiently explained.  *Cf. Ne. Hosp.*, 657 F.3d at 18 (declining to reach second step of *Chevron*

---

[13] The parties dispute whether the plain text of the Medicare Act, 42 U.S.C. § 1395hh(a)(4), automatically requires vacatur for a notice-and-comment violation, trumping the discretionary vacatur that is customary under the APA.  Def. Reply at 24, Pl. Opp'n Mem. at 43–44.  The Court does not reach that issue because it also concludes that the Secretary's action was arbitrary and capricious and that the *Allied-Signal* test requires vacatur.

analysis because new interpretation of the DSH calculation could not be applied retroactively to FY 1999–2002). As set forth above, the Secretary's rulemaking process was gravely flawed in several respects so that vacatur is appropriate.

The second *Allied-Signal* factor heavily favors vacatur because the Court's ruling affects reimbursement rates for past years that the Secretary has, through use of the new interpretation, tried to recalculate. The portion of the 2004 Final Rule at 69 Federal Register 48916, 49099, that announced the Secretary's interpretation of the Medicare Disproportionate Share Hospital Fraction, as codified in 2007 at 42 C.F.R. § 412.106(b)(2) and as further modified in 2010, is tantamount to the retroactive rulemaking that the D.C. Circuit held impermissible in *Northeast Hospital*. 657 F.3d at 17. Because the Secretary did not validly change her interpretation of the DSH calculation prior to FY 2007, and because there is "no statute that authorizes the Secretary to promulgate retroactive rules for DSH calculations," *id.*, the Secretary cannot impose her new interpretation on the FY 2007 calculations challenged in this case. Accordingly, the danger of disruption from vacatur is low. *See Heartland Reg'l Med. Ctr.*, 566 F.3d at 197.

## IV.   CONCLUSION

For the foregoing reasons, the Hospitals' motion for summary judgment [Dkt. 32] will be granted. The Secretary's motion for summary judgment [Dkt. 35] will be denied. The portion of the 2004 Final Rule at 69 Federal Register 48916, 49099, that announced the Secretary's interpretation of the Medicare Disproportionate Share Hospital Fraction, as codified in 2007 at 42 C.F.R. § 412.106(b)(2) and as further modified in 2010, will be vacated, and the case will be remanded to the Secretary for further action consistent with this Opinion.

A memorializing Order accompanies this Opinion.


DATE: November 15, 2012

_____/s/_____
ROSEMARY M. COLLYER
United States District Judge